UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Douglas Duane Bahl and                    Civil No. 08-5001(DSD/JJG)
Susan Kovacs-Bahl,

            Plaintiffs,

v.                                                    **ORDER**

County of Ramsey, Ramsey
County Sheriff's Department
and City of St. Paul,

            Defendants.


    Roderick J. Macpherson III, Esq., Minnesota Disability
    Law Center, 430 1st Avenue North, Suite 300, Minneapolis,
    MN 55401, counsel for plaintiffs.

    Thomas E. Ring, Ramsey County Attorney, 50 Kellogg
    Boulevard West, Suite 560, St. Paul, MN 55102 and Judith
    A. Hanson, St. Paul City Attorney, 15 West Kellogg
    Boulevard, Suite 750, St. Paul, MN 55102, counsel for
    defendants.


    This matter is before the court upon defendants' motions for

summary judgment and plaintiffs' motions for partial summary

judgment and to exclude testimony.  Based on a review of the file,

record and proceedings herein, and for the following reasons, the

court grants defendants' motions in part, grants plaintiffs' motion

for partial summary judgment and denies the motion to exclude

testimony.

**BACKGROUND**

This disability-discrimination action arises out of the arrest and detention of plaintiff Douglas Duane Bahl by defendants City of St. Paul (St. Paul) and County of Ramsey and the Ramsey County Sheriff's Department (together, Ramsey County). Bahl is deaf and uses American Sign Language (ASL) as his primary language. Bahl Aff. ¶ 3, ECF No. 109. Bahl attended Gallaudet University and holds a Masters Degree from the University of Minnesota. Bahl Dep. 52. His college classes were conducted in ASL. Bahl taught high school social studies, geography, civics, basic English, drama and math for fourteen years at the Minnesota School for the Deaf in Faribault, Minnesota. Id. at 53-54. Bahl currently instructs ASL at the University of Minnesota and St. Paul College. He reads English at a sixth-grade level, and usually communicates in ASL, though he uses a Blackberry handheld device to communicate by text and email. Bahl Dep. 186-87, ECF No. 112-2. When Bahl communicates with non-ASL speakers in person, he typically uses an interpreter, and alternatively communicates by writing.

On November 17, 2006, around 5:00 p.m., Bahl was driving to visit his then-girlfriend, plaintiff Susan Kovacs-Bahl[1] in a rehabilitation facility near Fairview Riverside Hospital. Id. at 97-100. He ignored a red light and drove through cross traffic in an intersection. St. Paul Police Officer Stephen Bobrowski

---

[1] Bahl and Kovacs-Bahl since married.

observed Bahl's actions and activated his lights and siren.  Bahl
stopped his car.  Id. at 100-01.  When Bobrowski reached the
driver's side of the car, Bahl shook his head, gestured to his ear
and said "no."  Id. at 101–104.  Bahl next gestured that he wanted
to communicate in writing.  Id.  Bobrowski was not carrying a pen
or paper, and he pointed to his mouth and said "drivers license"
and then made a card shape with his hands.  Bobrowski Dep. Ex. 1,
ECF No. 112-2.

Bahl claims that Bobrowski next pushed his shoulder, which was
painful, and Bahl leaned to the right.[2]  Bahl Dep. 109–10.
Bobrowski grabbed Bahl's wrist, and Bahl again pulled away because
it was painful.  Id. at 112.  Bahl reached to his right for paper
and a pen and began to write "joint" to tell Bobrowski that his
joints are sensitive.  Bobrowski then sprayed Bahl with aerosol
subject restraint, and Bahl started flailing his arms.  Id. at
115–16.  Bobrowski pulled Bahl from his car and then pulled Bahl's
arm behind his back.  See id. at 117–18.  Backup assistance
arrived, and after Bahl was restrained, an ambulance transported
him to Regions Hospital for treatment.

Bahl arrived at the hospital at 5:52 p.m.  Bobrowski told the
nurses that Bahl is deaf and asked for an interpreter.  When the
hospital interpreter arrived, Bobrowski told her that Bahl was

---

[2]  Although St. Paul maintains that Bahl first grabbed
Bobrowski and pulled him to the car, St. Paul accepts Bahl's
version of the facts for the purpose of this motion.

under arrest and could make phone calls.  Bobrowski Dep. 65–67.

Bahl communicated with hospital staff through the interpreter.

When police officers asked the interpreter to help communicate with

Bahl, she refused, saying that her job was only to interpret for

hospital matters.  Bahl agreed, saying that the police had to get

their own interpreter.  Bahl Dep. 125–26.  Hospital staff assessed

and treated Bahl.

> Meanwhile, Colleen Luna, police shift commander, prepared a
typewritten statement, which stated in full:

> 06235877

> Bahl, Douglas Duayne [sic]

> You have been arrested for

> GROSS MISDEMEANOR OBSTRUCTING WITH FORCE

> MN State Statute 609.50

> We will not be asking you any questions at this time.
> When an investigator interviews you a sign language
> interpreter can be provided if you wish.

Bahl Dep. Ex. 1, ECF No. 112-2.  Bobrowski picked up the statement

from the law-enforcement center, returned to the hospital and

presented the statement to Bahl.  Bahl nodded affirmatively after

looking at the statement.  Bobrowski Dep. 122-24.  When presented

with the statement at his deposition, Bahl stated: "I can read [the

words], but some of the words I don't understand."  Id. 135–36.

4

At the hospital, Bahl also had the following exchange with a deputy of the Ramsey County Sheriff, written on the charge statement:[3]

Bahl:      "Will you get me an interpreter"

Deputy:    "St. Paul would have to"

Bahl:      "When?"

Deputy:    "Its up to the investigators"

Bahl:      "Tonite?"

Deputy:    "St. Paul knows and they do not want to ask"

Bahl:      "I do not understand clearly between you and
           St. Paul — confusing."

Bahl Dep. Ex. 1.  Bahl also wrote: "ADA Law! must provide Interpreter or I'll file lawsuit" and "I feel it's urgent to act now — cuz of brutality."  Id.

Regions Hospital discharged Bahl at 8:36 p.m., and the physician notes state that his right eye was clear, and his left eye had significant periorbital swelling.  Ring Aff. Ex. 4, ECF No. 97-3.  Staff gave two prescriptions to Ramsey County, and instructed Bahl to take ibuprofen or Vicodin for pain as needed. Id.

Bobrowski transported Bahl to the Ramsey County Adult Detention Center (ADC) and transferred custody to Ramsey County in

---

[3] The deputy on duty did not identify his handwriting with certainty.  See Murphy Dep. 45 ("It looks like right here but can't be certain.").

5

the sally port to the jail.  Two corrections officers, Chad Lydon and Wesley Matsch were on duty in the booking area.  Lydon tried to talk to Bahl, who made a handwriting gesture.  Thereafter, Lydon and Bahl communicated through writing.  Once in the jail, Bahl waited in the open booking area.  A television in that area typically showed an orientation video with closed captions.  Bahl does not recall seeing the video.  Matsch began the intake forms on a computer.  Matsch completed the medical information questions by printing and modifying the form so that Bahl could respond in writing.  See Matsch Dep. Ex. 6.  Matsch also noted on the booking forms that Bahl is deaf.  Ring Aff Ex. 6.

After completing the booking process, Matsch asked nurses to examine Bahl.  The nurses cleaned his nose and gave him an ice pack.  Bahl asked the nurse to get him pain-relief medication, and she said that she would do so.  Bahl Dep. 365, 370-71.  Bahl asserts that he could not communicate with the nurses about how to get medication from his house.  Pl.'s Mem. Opp'n 8, ECF No. 113.

While still at the booking desk, Bahl had a "written conversation" in which he asked that Matsch and Lyndon allow him to use email to contact Kovacs-Bahl.  Bahl Dep. 351.  Matsch said that they could not do so, but offered use of a TTY.[4]  Matsch Dep. 68, ECF No. 97-6; Bahl Dep. 351-52, 366-68.  Bahl declined, saying that

---

[4] A TTY – also called a TDD – allows use of a telephone line to type a conversation.

he could not reach Kovacs-Bahl that way.  Matsch Dep. 68, ECF No. 97-6; Bahl Dep. 351-52, 366-68.  Next, Bahl asked Lydon to allow him to use email.  Lydon Dep. 54-56.  Lydon told Bahl that he did not have the authority to allow him to do so.  Id. at 58.  Lydon agreed to ask his supervisor about Bahl's request for email.  Id.  The supervisor, Brad Trelstad, denied the request, but said that the TTY was available.  Trelstad Dep. 20, ECF No. 112-5; Lydon Dep. at 60-61.  Lydon again told Bahl that he could not use email but that he could use a TTY.  Lydon Dep. 64.  Bahl became frustrated and Lydon directed him to sit down.  Id.

Whether Bahl then changed his mind and requested to use a TTY is unclear.  He testified that while still in the booking room "I came up with the idea, I asked, can I have a TTY?  They said, no, you'll have to use that tomorrow morning.  And I — because I thought of somebody else I could contact that had a TTY on their end."  Bahl Dep. 366-67.  After his counsel interjected to say that "there's some confusion" about the timing, Bahl then testified, "I made the request to contact [Kovacs-Bahl] through the use of a computer, but I don't remember requesting a TTY."  Id. at 367.

About an hour later, jail staff assigned Bahl to a cell in general housing, where he had a roommate, rather than in an orientation unit, where he would be alone.  He received pencils, paper, a vending card and coveralls.  The housing unit had two tiers of cells, and inmates are allowed out of their cells one tier

at a time.  The common area has an officer desk, telephones and a television.  Inmates may make monitored collect calls while allowed out of their cells, but generally are not allowed to place calls for another inmate.  Officers staff the desk during the day, and inmates are locked in their cells at night.  Inmates learn about jail rules through a handbook, with copies in the cells and at the officer's desk.  One experienced inmate is designated the "swamper," and he has additional responsibilities as a resource for inmates and staff in the housing unit.

On Saturday morning, Bahl asked the officer on duty a number of questions.  Bahl Dep. 431.  The officer answered the questions. Id.  Bahl states that he requested a TTY, but the ADC did not provide one.  Bahl Dep. 435.  Gary Hoven, the officer on duty, does not recall Bahl asking for a TTY but states that he offered to call Bahl's girlfriend or someone else for him.  Hoven Dep. Ex. 2, ECF No. 97-7.  Bahl declined.  Id.  The sergeant in charge states that he began inquiring about an interpreter, but that the guard reported: "Don't bother.  He's refusing an interpreter.  All he wants is e-mail."  Brommerich Aff. ¶¶ 9-10.  Hoven states that he asked the swamper to make sure Bahl had needed items.  Hoven Dep. Ex. 2.

Later on Saturday, a St. Paul Police investigator, Sergeant Bryant Gaden, came to the jail to interview Bahl.  Gaden did not bring an interpreter, and communicated in writing with Bahl:

| Bahl: | Can you get Sign Language interpreter? I already requested last night. Sign language is my primary language. |
| Gaden: | Not true |
| Bahl: | I am deaf and use ASL.  Please respect my language. |
| Gaden: | Writing is a language |
| Bahl: | English is my second language. More effective communication is through ASL not my 2nd language. |
| Gaden: | I will read you the rights form, you can read along.  Then I will go and look for interpreter. |
| Bahl: | Thanks! |
| Gaden: | Read them, if you understand initial each space then I will give you a copy. |
| Bahl: | Initials? |

Bahl Dep. Ex. 24, at 5-7.   Thereafter, Bahl completed the biographical section of the form, and initialed to show his understanding of each Miranda right.  Id. at 8.  Bahl then signed the form.  Id.  Gaden asked, "At this point you would like to stop and have an interpreter present?" and Bahl replied, "Yes please." Id. at 7.  Gaden ended the interview.  Thereafter, he decided that an interview was not necessary to the city's case and did not justify the cost of an interpreter.

On Sunday, Bahl asked Hoven for a TTY, writing "I need to call via TTY in regards to my work for tomorrow." Bahl Dep. Ex. 24, at 10, ECF No. 97-2. Hoven responded, "After noon. See what we can do." Id. On the same piece of paper, Hoven wrote:

> This is jail — hard to accommodate
> Don't get arrested again
> Lesson learn — jail sucks

Id. Bahl then communicated with another inmate, Windish, who relayed a message to Kovacs-Bahl at the hospital and to Bahl's employer. Later that night, an officer came to Bahl's cell and communicated – through Bahl's roommate – a message from Bahl's daughter:

> Your daughter called for you here to see how you were doing. She was mad they arrested you. She was cursing out the officers for arresting you. She told them you were law abiding & a good person & to let you go!

Id. at 19.

On Monday morning, the officer in Bahl's unit told Bahl that he had not yet been charged, and offered the TTY. Bahl declined. After lunch, the officer told Bahl that he had been charged, and that bail was set at $6,000 with court the next day. Bahl asked for the TTY, which was present at the officers' desk. Bahl used the TTY at the officer's desk because it needed to be plugged into a phone jack. Bahl made three calls. Later, Bahl was released from the ADC.[5]

---

[5] On September 14, 2007, a jury convicted Bahl of misdemeanor
(continued...)

On July 28, 2008, Bahl and Kovacs-Bahl began this action in Minnesota state court, claiming disability discrimination against St. Paul and Ramsey County under the Americans with Disabilities Act (ADA), section 504 of the Federal Rehabilitation Act (RA), the Minnesota Human Rights Act (MHRA) and common-law negligence.[6] St. Paul and Ramsey County timely removed, and now move for summary judgment. Bahl and Kovacs-Bahl move for partial summary judgment on certain affirmative defenses of St. Paul and Ramsey County and to exclude the expert testimony of James Bruton. The court now considers the motions.[7]

## DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

[5](...continued)
obstruction of legal process based on the November 17, 2006, traffic stop.

[6] On February 11, 2009, the court granted Ramsey County's motion to dismiss claims seeking a declaratory judgment, injunctive relief and for association discrimination. See ECF No. 47. Plaintiffs filed an amended complaint on March 4, 2009. See Am. Compl., ECF No. 48.

[7] Shortly after oral argument in this case, the Eighth Circuit heard argument in Loye v. Cnty. of Dakota, 625 F.3d 494 (8th Cir. 2010). Recognizing the potential impact of Loye on this case, the court notified the parties that it would hold the instant motions under advisement pending disposition of Loye by the Eighth Circuit.

P. 56(c);[8] see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of his claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

## I.   ADA, RA and MHRA Claims

Title II of the ADA forbids a public entity from excluding qualified individuals with disabilities from participating in or receiving the benefits of its services, programs or activities. 42

---

[8] The court cites the Federal Rules of Civil Procedure in effect at the time of the motions and hearing. Changes effective December 1, 2010, do not affect the outcome of this case.

U.S.C. § 12132.[9]   Thus, to prevail on a claim of disability discrimination, a plaintiff must allege that he or she (1) is a qualified individual with a disability, (2) was excluded from participating in or receiving the benefits of the service, program or activity, and (3) such exclusion was because of his or her disability.  See Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999).  An entity excludes a person disabled in communication when it fails to provide effective communication that allows meaningful access to services and activities.  Loye, 625 F.3d at 496, 500. The communication need not "produce the identical result or level of achievement," but rather must provide an "equal opportunity to gain the same benefit."  See id. at 499 (citation and internal quotation marks omitted).

Depending on the circumstances, effective communication "may require the use of auxiliary aids and services, such as interpreters for the hearing impaired." Id. at 496–97; see 28 CFR 35.160(b)(1).  Auxiliary aids include:

> Qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive

_____

[9]   Section 504 contains similar prohibitions with the additional requirement that the "program or activity receiv[e] Federal financial assistance."  29 U.S.C. § 794(a).  Likewise, the MHRA forbids discrimination "in the access to, admission to, full utilization of or benefit from any public service because of ... disability."  Minn. Stat. § 363A.12, subdiv. 1.  The court refers only to the ADA, but its analysis applies equally to section 504 and the MHRA.  See Yeng Thao v. City of St. Paul, 481 F.3d 565, 567 n.3 (8th Cir. 2007).

> listening systems, telephones compatible with hearing
> aids, closed caption decoders, open and closed
> captioning, telecommunications devices for deaf persons
> (TDD's), videotext displays, or other effective methods
> of making aurally delivered materials available to
> individuals with hearing impairments.[10]

28 C.F.R. § 35.104. The public entity must give "primary consideration" to furnishing the auxiliary aid requested by the disabled individual and honor the choice unless another effective means of communications exists. Id. § 35.160(b)(2); id. pt. 35, app. A. When the information exchanged is not complex or does not occur over a long period of time, a notepad and written materials may permit effective communication. Id. pt. 35, app. A pmbl.

An entity may show, as an affirmative defense, that the accommodation provided was effective, would have resulted in an undue burden or would have altered the fundamental nature of a program. See Randolph, 170 F.3d at 858; 28 C.F.R. § 35.160. The parties agree that Bahl and Kovacs-Bahl are qualified individuals with disabilities for purposes of the ADA, RA and MHRA.

---

[10] The addition of exchange of written notes to the definition of "auxiliary aid" effective March 15, 2011, confirms that such method is considered an auxiliary aid. See Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56164, 56177 (Sept. 15, 2010) (amending 35 C.F.R. § 34.104 effective March 15, 2011).

## II.  St. Paul

### A.  Traffic Stop

Bahl first claims that St. Paul violated the ADA, RA and MHRA when Bobrowski did not honor Bahl's request to communicate in writing.  Specifically, Bahl argues that not honoring his request excluded him from the service of an investigatory stop without use of excessive force.  As an initial matter, the Eighth Circuit has never held that police actions before an arrest are a service. Even if they are, Bahl's claim fails because he does not allege that St. Paul used excessive force.[11]  Moreover, the undisputed facts show that after Bobrowski touched Bahl's shoulder, Bahl reached into the interior of his car.  Events unfolded rapidly, and Bobrowski's concern about a suspect reaching further into his car, his decision to restrain Bahl and his use of force are objectively reasonable.  As a result, Bahl does not show that he was denied a service by St. Paul, and his claim fails.

Further, Bobrowski witnessed Bahl drive through traffic against a red light at rush hour.  This dangerous behavior posed a high threat to public safety.  Accord Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1086 (11th Cir. 2007).  The ADA, RA and MHRA do not require Bobrowski to grant Bahl's requested auxiliary aid when doing so would require him to turn his back on a driver who he had

---

[11] Bahl makes no claims that Bobrowski violated his civil rights or used excessive force: he only challenges the communication that occurred prior to the altercation.

just witnessed endanger public safety.  Under the circumstances, it would be unreasonable to expect Bobrowski immediately to return to his squad car to retrieve a pen and paper.  Bahl testified that he had been pulled over several times before and knew that he would need to show his drivers's license.  Bahl requested the auxiliary aid of writing using gestures; Bobrowski's decision first to try simple communication by using gestures to make a rectangle with his hands and saying "drivers license" was reasonable under the circumstances,[12] and allowed Bahl meaningful access to service. Therefore, summary judgment is warranted on his claim regarding the traffic stop.

### B.   Statement of Charges

Bahl next claims that St. Paul violated the ADA, RA and MHRA by not providing an ASL interpreter to tell Bahl the reason for his arrest.[13]  Bahl argues that the communication was not effective because English is his second language and he only reads at a sixth-grade level.  Bahl's claim fails for several reasons.  First, at the time Luna wrote the statement, Bahl's only request for an

---

[12] Indeed, Bahl states that, although he does not read lips as a daily means of communication, he can understand words in context. See Bahl Aff ¶ 4. ("I can sometimes understand a single word when the speaker says it slowly and if the word involves the context of the situation the speaker and I are in. For example, if ketchup is offered to me when I am buying a hamburger, I might understand the word 'ketchup.'").

[13] Minnesota Statutes § 611.32 does not create or establish liability for violation of the ADA or RA.  See Randolph v. Rodgers, 170 F.3d 850, 859 (8th Cir. 1999).

auxiliary aid was his request to Bobrowski to use writing.  The only evidence of Bahl requesting an interpreter on Friday is a note he wrote to a different entity, Ramsey County, after receiving Luna's note.  As a result, Luna was honoring Bahl's requested auxiliary aid.

Moreover, Bahl's argument that he cannot communicate effectively in English is not supported by the record.  The record demonstrates that he communicates effectively through writing — he repeatedly sought to use email at the ADC; he uses a Blackberry to communicate; he used a TTY at the ADC; he communicates in writing at medical appointments; and saved copious notes written between himself, officers and other detainees.  Further, the record specifically shows that he received effective communication about his reason for arrest.  He wrote to another detainee that he was arrested: "For fighting police."  Therefore, summary judgment is warranted on his claim regarding the statement of charges.

### C.   Custodial Interrogation

Lastly, Bahl argues that the city violated the ADA, RA and MHRA by failing to provide him the service of a custodial interview, and that it did so because of his disability. Interrogation of persons in custody cannot be characterized as a service for purposes of the ADA, RA and MHRA.  Indeed, the Fifth Amendment protects a detainee's right not to be interviewed.  The right to testify attaches at trial.  At the time of Bahl's arrest,

before being charged, he had the right not to communicate, not the right to testify.  The record shows an effective <u>Miranda</u> warning and a voluntary refusal to communicate without an interpreter. Therefore, Bahl cannot establish that he was denied a service due to his disability, and summary judgment is warranted.

###    D.   **Vicarious Official Immunity**

Bahl's MHRA claims also fail because St. Paul is immune from suit under the MHRA in this case.  Official immunity protects police officers and other public officials "from the fear of personal liability that might deter independent action and impair effective performance of their duties." <u>State by Beaulieu v. City of Mounds View</u>, 518 N.W.2d 567, 569 (Minn. 1994) (citation and internal quotation marks omitted).  Police officers are protected by official immunity because "the community cannot expect its police officers to do their duty and then to second-guess them when they attempt conscientiously to do it."  <u>Id.</u> at 570 (citation and internal quotation marks omitted).

A public official who exercises "judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." <u>Id.</u> at 569–70.  An official commits a malicious wrong when he intentionally commits an act that he has reason to believe is prohibited. <u>Id.</u> at 571.  As a result, the court examines the "principally objective" legal reasonableness of the official's actions. <u>Id.</u>

18

When an official is immune from suit on a particular issue, generally the "government employer will enjoy vicarious official immunity from a suit arising from the employee's conduct." Schroeder v. St. Louis Cnty., 708 N.W.2d 497, 508 (Minn. 2006).  To extend individual immunity to the entity, the actions of the employee must be within the confines of an assigned duty.  S.W. v. Spring Lake Park Sch. Dist. No. 16, 592 N.W.2d 870, 877 (Minn. Ct. App. 1999).

Bobrowski's decision initially to try to communicate with Bahl using gestures and lip reading before leaving Bahl alone to retrieve a pen and paper were objectively reasonable and lawful. Further, Luna's decision to write a simple description of the offense for which Bahl was arrested was also reasonable and lawful, especially in light of Bahl's request to communicate in writing. Lastly, Gaden's communication with Bahl in writing about his Miranda rights, and decision not to interview Bahl were reasonable and lawful.  As a result, each official is immune from suit under the MHRA.

The record shows that St. Paul has policies and trains police officers in communication, including communication with deaf persons.  See Frazer Dep. 45–48, 53–56, 61–64 ("We spend a huge amount of time in academy FTO, and in-service training on the issues of communication ....  The basis of our job is to have effective communication.").  As a result, they acted under a duty

19

from St. Paul.  Moreover, Bobrowski, Luna and Gaden all exercised discretion in their duty to communicate.  Therefore, St. Paul is immune from Bahl's MHRA claims.

### E.   Negligence

Bahl next claims that St. Paul violated its statutory duty to provide an interpreter:

> **Proceedings at time of apprehension or arrest.** Following the apprehension or arrest of a person disabled in communication for an alleged violation of a criminal law, the arresting officer, sheriff or other law enforcement official shall immediately make necessary contacts to obtain a qualified interpreter and shall obtain an interpreter at the earliest possible time at the place of detention.  A law enforcement officer shall, with the assistance of the interpreter, explain to the person disabled in communication, all charges filed against the person, and all procedures relating to the person's detainment and release.

Minn. Stat. 611.32 subdiv. 2.  Police do not violate the statute where a person communicates effectively in writing.  State v. Kail, 760 N.W.2d 16, 20 (Minn. Ct. App. 2009).  The court has already determined that written communication between Bahl and St. Paul was effective.  Therefore, § 611.32 does not create a duty for St. Paul to provide an interpreter for Bahl to communicate the reason for his arrest and detention, and Bahl's claim fails.  Accordingly, summary judgment in favor of St. Paul is warranted.

## III.  Claims Against Ramsey County

Bahl claims that Ramsey County violated the ADA, RA and MHRA by failing to provide information regarding jail procedures, failing to provide an ASL interpreter for contact with nurses and

failing to provide a method to communicate with persons outside the jail. Kovacs-Bahl also claims that Ramsey County discriminated against her in violation of the ADA, RA and MHRA by failing to allow Bahl to use email or a TTY to contact her.

### A.   Jail Procedures

Bahl argues that Ramsey County denied him information about jail procedures, including procedures for release. Ramsey County makes information available to all detainees in three ways: an inmate handbook placed in cells and available at the officer's desk, a video with closed-captioning in the booking area and by answering questions asked by detainees. Bahl argues that Ramsey County did not tell him to watch the video and that there is no evidence that captioning was active on the television. Bahl Aff. ¶ 12. Bahl further argues that Ramsey County did not personally give him an inmate handbook or tell him where to find one. Id. ¶ 14. Ramsey County responds that it does not direct any detainee to watch the video or tell any detainee to read the handbook.

Viewing the facts in a light most favorable to Bahl, Ramsey County provided the same service and same access to Bahl as it does to all detainees. Even assuming that Bahl did not see the video and that the captions were not turned on, Bahl had meaningful — indeed equal — access to information. Moreover, the record shows Bahl asking questions and receiving information from ADC staff about jail procedure, release, and charging decisions. Bahl Dep.

Ex. 24, ECF No. 97-2.  In short, no evidence shows that Ramsey
County failed to provide meaningful access to information.
Therefore, Bahl's claim fails, and summary judgement is warranted.[14]

B.   **Communication with Nurses**

Bahl next claims that Ramsey County failed to provide
meaningful access to medical treatment while he was in the ADC.
Specifically, Bahl argues that the failure to provide an
interpreter for his communications with the nurses prevented him
from receiving medical care.  Bahl states that he didn't ask some
questions because he felt rushed by the line of other detainees
waiting to see the nurse.  Bahl Dep. at 735.  Bahl also states that
he was unable to ask the nurses how to get another prescription
from home.[15]  Pls.' Mem. Opp'n 27,

---

[14] Bahl's argument that Ramsey County violated Minnesota
Statutes § 611.32 subdiv. 2 is without merit.  The statute plainly
applies to arresting officers or entities, not the detaining
entity.  See Minn. Stat. § 611.32 subdiv. 2. ("Following the
apprehension or arrest of a person disabled in communication for an
alleged violation of a criminal law, the arresting officer, sheriff
or other law enforcement official shall immediately make necessary
contacts to obtain a qualified interpreter and shall obtain an
interpreter at the earliest possible time at the place of
detention.").  Bahl offers no authority for applying § 611.32
against the detaining entity.  Even if § 611.32 applied, the court
has already determined that Bahl was not disabled in communication
because he communicated effectively in writing.  Therefore, his
negligence claim also fails, and summary judgment is warranted on
this basis.

[15] Bahl told Regions Hospital, through an interpreter, that he
takes "either naproxen or indomethicin" [sic].  Ring Aff. Ex. 4.

22

The record is contrary to Bahl's assertions.  All of his interactions with nurses involved passing medication and providing ice packs for his injury.  At no time did he require more intense medical treatment or assessment.  The record shows that Bahl saw nurses at every shift and that he requested and received pain medication and ice packs every day.  Wuornos Dep. Ex. 5, ECF No. 97-6.  Bahl's decision not to ask questions to avoid delaying the line or because he "didn't want to ask the nurse about the medication in writing," does not mean that Ramsey County failed to provide meaningful access via written communications.  See Bahl Dep. 735, 770.  Moreover, when asked if someone could bring his medications from home, he answered, "No."  Matsch Dep. Ex. 6, ECF No. 97-6.  Further, Bahl recalls effective communication.  See Bahl Dep. 733 (stating that "one nurse was more willing to listen to my concerns versus this other nurse ....").  Last, Ramsey County introduced evidence of numerous occasions when Bahl communicated in writing with doctors and nurses about more-complex medical issues.  See Feuerhake Aff. Ex. 1; Hanson Aff. Ex. Q.  Therefore, Bahl received effective communication and equal access to medical services, and summary judgment is warranted.

**C.   Communication with Persons Outside the ADC**

Bahl and Kovacs-Bahl first argue that Ramsey County unlawfully refused to provide Bahl with email access.  Ramsey County allows limited, monitored phone calls before intake and when detainees are

allowed in the common areas.  As an initial matter, email is not a modification of a telephone call; it is an entirely different service.  Even if it were a modification, Bahl offers no evidence that email or internet access were available on a computer in booking or the officer's desk in the cell area, or that Ramsey County could, over the weekend, make that service available. Further, Ramsey County offered Bahl use of a TTY, and he refused.[16] Therefore, Bahl and Kovacs-Bahl's claims that Ramsey County discriminated by failing to provide email fails.

Bahl and Kovacs-Bahl next argue that Ramsey County failed to provide a TTY.  The ADA, RA and MHRA require Ramsey County to provide meaningful access to telephone services.  Detainees at the ADC do not have unfettered, immediate access to telephone services. As a result, Ramsey County was not required to provide a TTY immediately to Bahl.  However, the ADA, RA and MHRA require Ramsey County to provide Bahl a TTY within a reasonable time after he requested access to one.[17]

---

[16] Bahl states that he could not reach Kovacs-Bahl via TTY because she did not have one in the hospital.  Bahl fails to explain, however, why he could not have used a relay service, which he has experience using, to communicate to the hospital.

[17] Ramsey County argues that Bahl is estopped from bringing a claim for failure to provide telephone service because he refused to use a TTY on Friday night.  This defense is without merit.  Bahl did not permanently waive telephone service by his Friday refusal. If Bahl later requested use of a TTY, Ramsey County had a duty to provide one within a reasonable time.

Bahl claims that he asked for a TTY on Friday, Saturday, Sunday and Monday, but Ramsey County did not provide one until Monday. In response, Ramsey County argues that it repeatedly offered him access to a TTY on Friday, and he declined. Ramsey County also argues that guards offered to make a call for Bahl and the only record of a request for a TTY is on Sunday, between 3 and 11 pm, after which the guards provided access the next morning. The court must deny summary judgment when, as here, a genuine dispute of a material fact exists. A reasonable jury could discredit the testimony of the guards and credit Bahl's testimony that he requested a TTY after his refusals on Friday, but Ramsey County did not accommodate his request within a reasonable time. As a result, a single fact question remains: did Ramsey County provide access to a TTY within a reasonable time after Bahl's request? Therefore, summary judgment is not warranted on Bahl and Kovacs-Bahl's claims that Ramsey County failed timely to provide a TTY.

**D.  Vicarious Official Immunity**

Bahl's MHRA claims about jail procedures, treatment by nurses and use of email also fail because Ramsey County is immune from suit under the MHRA for those claims. The actions of ADC staff required discretion in exercising their duties to communicate and to provide medical care. MacPherson Aff. Ex. S (Ramsey County policies regarding non-English-speaking and deaf detainees). The

25

failure of staff to communicate jail procedures to Bahl individually, when they do not do so for any detainee; the decisions of the nurses to communicate with Bahl about medication and an ice pack using gestures and writing; and the decision of staff to refuse Bahl's email request and offer use of a TTY were all objectively reasonable and lawful. As a result, each official is immune from suit under the MHRA. The employees acted under a duty imposed by Ramsey County and, therefore, Ramsey County has vicarious official immunity for Bahl and Kovacs-Bahl's MHRA claims.[18]

## IV. Affirmative Defenses of St. Paul and Ramsey County

The parties agree that the court may enter partial summary judgment against St. Paul for its defenses of ADA and RA immunity, lack of constitutional injury, estoppel and statute of limitations and against Ramsey County for its defenses of ADA and RA immunity, lack of constitutional injury and statute of limitations. See Stipulation 2, ECF No. 115; Defs.' Resp. 3–4, ECF No. 108. Further, the court has already determined that Ramsey County's estoppel defense as to TTY use is without merit. Therefore, partial summary judgment in favor of Bahl and Kovacs-Bahl is warranted.

---

[18] Because fact questions remain about the timeliness of Ramsey County's response to Bahl's TTY request, it is not entitled to immunity on that claim.

**V.    Motion to Exclude Expert Testimony**

Bahl and Kovacs-Bahl move to exclude particular testimony from Ramsey County's expert witness, James Bruton.  The testimony at issue addresses whether Ramsey County effectively communicated with Bahl.  The court has already determined that Bahl received effective communication without consideration of Bruton's opinions. The instant motion appears irrelevant to the remaining dispute about Bahl's request to use the TTY.  Therefore, the instant motion is moot.  The court will entertain a new motion to exclude should it become necessary.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1.    The motion for partial summary judgment by Bahl and Kovacs-Bahl [Doc. No. 88] is granted;

2.    The motion for summary judgment by St. Paul [Doc. No. 82] is granted;

3.    The motion for summary judgment by Ramsey County [Doc. No. 85] is granted in part:

       a.    The motion is denied as to the claim that Ramsey County failed to provide access to a TTY;

       b.    The motion is granted as to all other claims;

    4.   The motion to exclude expert testimony [Doc. No. 90] is denied without prejudice.

Dated:  December 29, 2010

                                      s/David S. Doty
                                      David S. Doty, Judge
                                      United States District Court